# UNITED STATES DISTRICT COURT
## DISTRICT OF SOUTH CAROLINA
## CHARLESTON DIVISION

| | |
|---|---|
| **DANIEL COHEN** | **MDL NO. 2873** |
| **AND** | **MASTER DOCKET NO.: 2:18-mn-2873-RMG** |
| **CHERRIE COHEN** | **JUDGE RICHARD GERGEL** |
| Plaintiffs, | **CIVIL ACTION NO.: _____** |
| vs. | |
| **3M COMPANY (f/k/a Minnesota Mining and Manufacturing Company);** | **DIRECT FILED COMPLAINT AND JURY DEMAND PURSUANT TO CMO#3** |

**3M COMPANY (f/k/a Minnesota Mining and
        Manufacturing Company);
AGC CHEMICALS AMERICAS, INC.;
AMEREX CORPORATION;
ARCHROMA U.S., INC.;
ARKEMA INC.;
BASF CORPORATION, Individually and as
        Successor-in-Interest to Ciba, Inc.;
BUCKEYE FIRE EQUIPMENT COMPANY;
CARRIER FIRE & SECURITY
        CORPORATION;
CARRIER GLOBAL CORPORATION;
CHEMDESIGN PRODUCTS, INC.;
CHEMGUARD, INC.;
CHEMICALS INCORPORATED;
CHUBB FIRE, LTD.;
CLARIANT CORPORATION, Individually and
        as Successor-in-Interest to Sandoz
        Chemical Corp.;
CORTEVA, INC.;
DAIKIN AMERICA, INC.;
DEEPWATER CHEMICALS, INC.;
DUPONT DE NEMOURS, INC. (f/k/a
        DowDuPont, Inc.);
DYNAX CORP.;
E.I. DUPONT DE NEMOURS AND
        COMPANY, Individually and as
        Successor-in-Interest to DuPont
        Chemical Solutions Enterprise;
KIDDE PLC, INC.;
NATION FORD CHEMICAL COMPANY;
NATIONAL FOAM, INC.;**

PERIMETER SOLUTIONS, LP;
RAYTHEON TECHNOLOGIES
     CORPORATION;
THE CHEMOURS COMPANY, Individually
     and as Successor-in-Interest to DuPont
     Chemical Solutions Enterprise;
THE CHEMOURS COMPANY FC, LLC,
     Individually and as Successor-in-Interest
     to DuPont Chemical Solutions
     Enterprise;
TYCO FIRE PRODUCTS L.P.;
UNITED TECHNOLOGIES CORP.;
     and
UTC FIRE & SECURITY AMERICAS CORP.,
     INC.

          Defendants.

## COMPLAINT

COMES NOW Plaintiffs, Daniel Cohen ("Plaintiff") and Cherrie Cohen, by and through undersigned counsel, and bring this Complaint against the above-named Defendants and alleges as follows:

## INTRODUCTION

1.    Plaintiff brings this action for damages for personal injury resulting from exposure to aqueous film-forming foams ("AFFF") containing the toxic chemicals collectively known as per and polyfluoroalkyl substances ("PFAS"). PFAS includes, but is not limited to, perfluorooctanoic acid ("PFOA") and perfluorooctane sulfonic acid ("PFOS") and related chemicals including those that degrade to PFOA and/or PFOS.

2.    AFFF is a specialized substance designed to extinguish petroleum-based fires. It has been used for decades by military and civilian firefighters to extinguish fires in training and in response to Class B fires.

3.    Defendants collectively designed, marketed, developed, manufactured, distributed, released, trained users, produced instructional materials, promoted, sold, and/or otherwise released into the stream of commerce AFFF products with knowledge that it contained highly toxic and bio persistent PFAS which would expose end users of the product to the risks associated with PFAS.  Further, Defendants designed, marketed, developed, manufactured, distributed, released, trained users, produced instructional materials, promoted, sold and/or otherwise handled and/or used underlying chemicals and/or products added to AFFF products which contained PFAS for use in firefighting.

4.    PFAS binds to proteins in the blood of humans exposed to the material and remains and persists over long periods of time. Due to their unique chemical structure, PFAS accumulates in the blood and body of exposed individuals.

5.    PFAS are highly toxic and carcinogenic chemicals. Defendants knew, or should have known, that PFAS remain in the human body while presenting significant health risks to humans.

6.    Defendants' PFAS-containing AFFF products were used by Plaintiff in their intended manner and for the purposes for which they were intended, without significant change in their condition when they left Defendants' control.  Plaintiff was unaware of the dangerous properties of Defendants' AFFF products and relied on Defendants' warnings and instructions as to the proper handling of the products. Plaintiff's

consumption, inhalation, and/or dermal absorption of PFAS from Defendants' AFFF products caused Plaintiff to develop the serious medical conditions and complications alleged herein.

7.      Through this action, Plaintiff seeks to recover compensatory, punitive, and other damages arising out of the permanent and significant damages sustained as a direct result of exposure to Defendants' AFFF products at various locations during the course of his training, firefighting activities, and/or military service. Plaintiff further seeks any appropriate injunctive, equitable, and declaratory relief arising from the same.

## JURISDICTION AND VENUE

8.      Subject-matter jurisdiction is conferred on this Court over this action pursuant to under 28 U.S.C. § 1332(a)(1) as complete diversity exists between Plaintiff and Defendants and the amount in controversy exceeds $75,000, exclusive of interest and costs.

9.      Pursuant to Case Management Order No. 3 ("CMO #3") in MDL No. 2873, issued by Judge Richard M. Gergel of this Honorable Court, this Complaint is being filed in the U.S. District Court for the District of South Carolina. In accordance with CMO #3, Plaintiff designates the United States District Court for the Middle District of Florida as the "home venue" where Plaintiff would have otherwise filed suit pursuant to 28 U.S.C. § 1391.

10.     But for the aforementioned CMO #3, venue is proper before the United States District Court for the Middle District of Florida because it is the judicial district in which Plaintiff is a resident and/or citizen, a substantial part of the events or omissions giving rise to the claim occurred in that district, and Defendants conduct business within

that district. Plaintiff respectfully requests that, at the time of the transfer of this action back to trial court for further proceedings, this case be transferred to the United States District Court for the Middle District of Florida.

11.     The United States District Court for the Middle District of Florida has personal jurisdiction over Defendants because at all times relevant to this lawsuit, Defendants manufactured, designed, marketed, distributed, released, promoted, and/or otherwise sold (directly or indirectly) PFAS-containing AFFF products to various locations, such that each Defendant knew or should have known that said products would be delivered to areas in the State of Florida. Therefore, the exercise of jurisdiction over the Defendants by the United States District Court for the Middle District of Florida does not offend traditional notions of fair play and substantial justice.

## **PARTIES**

### *Plaintiff*

12.     Plaintiffs Daniel Cohen and Cherrie Cohen are residents of Leesburg, Florida.

13.     Plaintiff was exposed to Defendants' PFAS-containing AFFF products during his time in the naval service, training, in shipboard firefighting, and the US Navy at Great Lakes, Illinois Recruit Training Center, Naval Training Center, Naval Submarine Base Connecticut, Dam Neck Virginia, Port Hueneme California, Yokosuka Japan, Pearl harbor HI CG, Norfolk VA CG, Yorktown VA, Chin-Hae Korea, Subic Bay Philippines, and USS Josephus Daniels, from approximately 1976 to 1982.

5

14.     As a result of Plaintiff's exposure to Defendants' PFAS-containing AFFF products, Plaintiff was diagnosed with hypothyroidism, a specific form of thyroid disease, and other illnesses which has caused Plaintiff to suffer severe personal injuries, pain, suffering, and emotional distress.

15.     Plaintiff's injuries, pain, suffering, and emotional distress were directly and proximately caused by Plaintiff's exposure to Defendants' PFAS-containing AFFF products.

*Defendants*

16.     Defendant **3M Company (f/k/a Minnesota Mining and Manufacturing Company) ("3M")** is a Delaware corporation with its principal place of business at 3M Center, St. Paul, MN 55144.  3M does and/or has done business throughout the United States, including those states and locations where Plaintiff was exposed, and manufactured and sold AFFF.

17.     Defendant **AGC Chemicals Americas Inc. ("AGCCA")** is Delaware corporation with its principal place of business at 55 East Uwchlan Avenue, Suite 201, Exton, PA 19341. Upon information and belief, AGCCA is a subsidiary of AGC, Inc., a Japanese corporation formerly known as Asahi Glass Company, Ltd.  AGCCA does and/or has done business throughout the United States, including those states and locations where Plaintiff was exposed, and manufactured and sold AFFF.

18.     Defendant **Amerex Corporation ("Amerex")** is an Alabama corporation with its principal place of business at 7595 Gadsden Highway, Trussville, AL 35173.  In 2011, Amerex acquired Solberg Scandinavian AS, one of the largest manufacturers of

AFFF products in Europe.  Amerex does and/or has done business throughout the United States, including those states and locations where Plaintiff was exposed, and manufactured and sold AFFF.

19.    Defendant **Archroma U.S., Inc. ("Archroma U.S.")** is a Delaware corporation with its principal place of business located at 5435 77 Center Dr., #10, Charlotte, NC 28217. Upon information and belief, Archroma U.S. is a subsidiary of Archroma Management, LLC.  Upon information and belief, Archroma U.S. was formed in 2013 when Defendant Clariant Corporation divested its textile chemicals, paper specialties, and emulsions business to SK Capital Partners.  Archroma U.S. does and/or has done business throughout the United States, including those states and locations where Plaintiff was exposed, and manufactured and sold AFFF.

20.    Defendant **Arkema Inc. ("Arkema")** is a corporation organized and existing under the laws of Pennsylvania with a principal place of business at 900 First Avenue, King of Prussia, PA 19406. Upon information and belief, the assets of Arkema's fluorochemical business were purchased by Defendant DuPont in 2002.  Arkema does and/or has done business throughout the United States, including those states and locations where Plaintiff was exposed, and manufactured and sold AFFF.

21.    Defendant **BASF Corporation ("BASF")** is a corporation organized and existing under the laws of Delaware with a principal place of business at 100 Park Avenue, Florham Park, NJ 07932. On information and belief, BASF is the successor-in-interest to Ciba-Geigy, Inc., Ciba Specialty Chemicals Company, and Ciba, Inc., a Swiss specialty chemicals company, that manufactured fluorosurfactants containing PFOA used in AFFF.

7

On information and belief, BASF is the largest affiliate of BASF SE and the second largest producer and marketer of chemicals and related products in North America. BASF does and/or has done business throughout the United States, including those states and locations where Plaintiff was exposed, and manufactured and sold AFFF.

22.     Defendant **Buckeye Fire Equipment Company ("Buckeye")** is a corporation organized and existing under the laws of Ohio with its principal place of business at 110 Kings Road, Kings Mountain, NC 28086. Buckeye does and/or has done business throughout the United States, including those states and locations where Plaintiff was exposed, and manufactured and sold AFFF.

23.     Defendant **Carrier Fire & Security Corporation ("Carrier Fire")** is a Delaware Corporation with its principal place of business at 13995 Pasteur Boulevard, Palm Beach Gardens, FL 33418. Carrier Fire does and/or has done business throughout the United States, including those states and locations where Plaintiff was exposed, and manufactured and sold AFFF.

24.     Defendant **Carrier Global Corporation ("Carrier Global")** is a Delaware corporation with its principal place of business located at 13995 Pasteur Boulevard, Palm Beach Gardens, FL 33418. On information and belief, Carrier Global was formed in March 2020 when Defendant United Technologies Corporation spun off its fire and security business before it merged with Raytheon Company in April 2020. On information and belief, Kidde-Fenwal, Inc., a manufacturer of AFFF products, became a subsidiary of Carrier Global when Defendant United Technologies Corporation spun off its fire and security business in March 2020. Carrier Global does and/or has done business throughout

8

the United States, including those states and locations where Plaintiff was exposed, and manufactured and sold AFFF.

25.     Defendant **ChemDesign Products, Inc. ("ChemDesign")** is a Delaware corporation with its principal place of business at 2 Stanton Street, Marinette, WI 54143. ChemDesign does and/or has done business throughout the United States, including those states and locations where Plaintiff was exposed, and manufactured and sold AFFF.

26.     Defendant **Chemguard, Inc. ("Chemguard")** is a corporation organized and existing under the laws of Texas with its principal place of business at One Stanton Street, Marinette, WI 54143.  Upon information and belief, Chemguard was acquired by Defendant Tyco International Ltd. in 2011 and is a subsidiary of Johnson Controls International PLC.  Chemguard does and/or has done business throughout the United States, including those states and locations where Plaintiff was exposed, and manufactured and sold AFFF.

27.     Defendant **Chemicals Incorporated ("Chemicals, Inc.")** is a corporation organized and existing under the laws of Texas with its principal place of business located at 12321 Hatcherville, Baytown, TX 77520. Chemicals, Inc. does and/or has done business throughout the United States, including those states and locations where Plaintiff was exposed, and manufactured and sold AFFF.

28.     Defendant **Chubb Fire, Ltd. ("Chubb")** is a foreign private limited company, United Kingdom registration number 134210, with offices at Littleton Road, Ashford, Middlesex, United Kingdom TW15 1TZ. Upon information and belief, Chubb is or has been composed of different subsidiaries and/or divisions, including, but not limited

to, Chubb Fire & Security, Ltd., Chubb Security PLC, Red Hawk Fire & Security, LLC, and/or Chubb National Foam, Inc. Upon information and belief, Chubb was part of Defendant UTC Fire & Security Americas Corporation, Inc. Chubb does and/or has done business throughout the United States, including those states and locations where Plaintiff was exposed, and manufactured and sold AFFF.

29. Defendant **Clariant Corporation ("Clariant")** is a corporation organized and existing under the laws of New York with a principal place of business at 4000 Monroe Road, Charlotte, NC 28205. Upon information and belief, Clariant is successor-in-interest to Sandoz Chemicals Corporation ("Sandoz"). Upon information and belief, Sandoz spun off its specialty chemicals business to form Clariant in 1995. Clariant does and/or has done business throughout the United States, including those states and locations where Plaintiff was exposed, and manufactured and sold AFFF.

30. Defendant **Corteva, Inc. ("Corteva")** is a Delaware corporation with its principal place of business located at 974 Centre Road, Wilmington, DE 19805. Corteva does and/or has done business throughout the United States, including those states and locations where Plaintiff was exposed, and manufactured and sold AFFF.

31. Defendant **Daikin America, Inc. ("Daikin America, Inc.")** is a corporation organized and existing under the laws of Delaware with its principal place of business at 20 Olympic Drive, Orangeburg, NY 10962. Upon information and belief, Daikin America, Inc. was established in 1991 and is a subsidiary of Daikin Industries Ltd., a corporation organized under the laws of Japan, having its principal place of business in Osaka, Japan. Daikin America, Inc. does and/or has done business throughout the United

States, including those states and locations where Plaintiff was exposed, and manufactured and sold AFFF.

32.     Defendant **Deepwater Chemicals, Inc. ("Deepwater")** is a corporation organized under the laws of Delaware with its principal place of business located at 196122 E County Road 40, Woodward, OK, 73801.  Deepwater does and/or has done business throughout the United States, including those states and locations where Plaintiff was exposed, and manufactured and sold AFFF.

33.     Defendant **Dupont de Nemours, Inc. f/k/a DowDuPont, Inc. ("Dupont de Nemours Inc.")** is a corporation organized and existing under the laws of Delaware with its principal place of business at 974 Centre Road, Wilmington, DE 19805 and 2211 H.H. Dow Way, Midland, MI 48674.  Dupont de Nemours Inc. does and/or has done business throughout the United States, including those states and locations where Plaintiff was exposed, and manufactured and sold AFFF.

34.     Defendant **Dynax Corporation ("Dynax")** is a corporation organized and existing under the laws of Delaware having a principal place of business at 103 Fairview Park Drive, Elmsford, NY 10523.  Dynax does and/or has done business throughout the United States, including those states and locations where Plaintiff was exposed, and manufactured and sold AFFF.

35.     **Defendant E.I. du Pont de Nemours and Company ("DuPont")** is a corporation organized under the laws of the State of Delaware with its principal place of business located at 974 Centre Road, Wilmington, DE 19805. DuPont is a successor-in-interest to DuPont Chemical Solutions Enterprise ("DuPont Chemical"), a Delaware

corporation with a principal place of business located at 1007 Market Street, Wilmington, DE 19898. DuPont does and/or has done business throughout the United States, including those states and locations where Plaintiff was exposed, and manufactured and sold AFFF.

36.     Defendant **Kidde PLC, Inc. ("Kidde PLC, Inc.)** is a Delaware corporation with its principal place of business at 9 Farm Springs Road, Farmington, CT 06032. Upon information and belief, Kidde PLC, Inc. was part of Defendant UTC Fire & Security Americas Corporation, Inc. Upon information and belief, Kidde PLC was formerly known as Williams Holdings, Inc. and/or Williams US, Inc. Kidde PLC, Inc. does and/or has done business throughout the United States, including those states and locations where Plaintiff was exposed, and manufactured and sold AFFF.

37.     Defendant **Nation Ford Chemical Company ("Nation Ford")** is a South Carolina corporation with its principal place of business at 2300 Banks Street, Fort Mill, SC 29715. Nation Ford does and/or has done business throughout the United States, including those states and locations where Plaintiff was exposed, and manufactured and sold AFFF.

38.     Defendant **National Foam, Inc. ("National Foam")** is a corporation organized under the laws of the State of Delaware with its principal place of business located at 141 Junny Road, Angier, NC 27501. On information and belief, National Foam currently manufactures the Angus brand of AFFF products, is a subsidiary of Angus International Safety Group, Ltd., and is the successor-in-interest to Angus Fire Armour Corporation. On information and belief, National Foam merged with Defendant Chubb Fire Ltd. to form Chubb National Foam, Inc. in or around 1988. National Foam does and/or

12

has done business throughout the United States, including those states and locations where Plaintiff was exposed, and manufactured and sold AFFF.

39.     Defendant **Perimeter Solutions, LP ("Perimeter Solutions")** is a limited partnership organized and existing under the laws of Delaware with its principal place of business at 8000 Maryland Ave., Suite 350, Clayton, MO 63105. Perimeter Solutions does and/or has done business throughout the United States, including those states and locations where Plaintiff was exposed, and manufactured and sold AFFF.

40.     Defendant **Raytheon Technologies Corporation ("Raytheon Technologies")** is a corporation organized and existing under the laws of the State of Delaware with a principal place of business located at 1000 Wilson Boulevard, Arlington, VA 22209. Raytheon does and/or has done business throughout the United States, including those states and locations where Plaintiff was exposed.

41.     Defendant **The Chemours Company ("Chemours Co.")** is a corporation organized under the laws of the State of Delaware with its principal place of business located at 1007 Market Street, P.O. Box 2047, Wilmington, DE, 19899.  In 2015, DuPont spun off its performance chemicals business line, which includes its fluoroproducts business, to Chemours Co., and Chemours Co. has since been an independent, publicly-traded company.  Chemours Co. does and/or has done business throughout the United States, including those states and locations where Plaintiff was exposed, and manufactured and sold AFFF.

42.     Defendant **The Chemours Company FC, LLC ("Chemours FC")**, a successor-in-interest to DuPont Chemical, is a limited liability company organized under

the laws of the State of Delaware with its principal place of business located at 1007 Market Street, Wilmington, DE, 19899. Chemours FC does and/or has done business throughout the United States, including those states and locations where Plaintiff was exposed, and manufactured and sold AFFF.  Defendants E. I. Du Pont de Nemours and Company; The Chemours Company; The Chemours Company FC, LLC; Corteva, Inc.; and DuPont de Nemours, Inc. are collectively referred to as **"DuPont"** throughout this Complaint.

43.     Defendant **Tyco Fire Products LP ("Tyco")** is a limited partnership organized and existing under the laws of Delaware with its principal place of business at 1400 Pennbrook Parkway, Lansdale, PA 19446.  Upon information and belief, Tyco is the successor-in-interest to The Ansul Company ("Ansul"), having acquired Ansul in 1990.  Upon information and belief, Tyco acquired the Chemguard brand in 2011 and continues to sell Chemguard AFFF products through its Chemguard Specialty Chemicals division.  Tyco does and/or has done business throughout the United States, including those states and locations where Plaintiff was exposed, and manufactured and sold AFFF.

44.     Defendant **United Technologies Corporation** ("United Technologies") is a foreign corporation organized and existing under the laws of the State of Delaware with its principal place of business at 8 Farm Springs Road, Farmington, CT 06032.  United Technologies does and/or has done business throughout the United States, including those states and locations where Plaintiff was exposed, and manufactured and sold AFFF.

45.     Defendant **UTC Fire & Security Americas Corporation, Inc. ("UTC")** is a Delaware corporation with its principal place of business at 13995 Pasteur Blvd., Palm Beach Gardens, FL 33418.  Upon information and belief, UTC was a division of Defendant

United Technologies Corporation. UTC does and/or has done business throughout the United States, including those states and locations where Plaintiff was exposed, and manufactured and sold AFFF.

46.     At all times relevant to this litigation, upon information and belief, each of the named Defendants designed, developed, manufactured, marketed, distributed and/or sold the PFAS-containing AFFF products to which Plaintiff was exposed, including in those states and locations where Plaintiff was exposed.

47.     Each of the Defendants designed, developed, manufactured, marketed, and/or sold the PFAS-containing AFFF products to which Plaintiff was exposed, and directly and proximately caused Plaintiff to develop hypothyroidism, a specific form of thyroid disease, and other illnesses and suffer severe personal injuries, pain, suffering, and emotional distress.

48.     When reference is made in this Complaint to any act or omission of any of the Defendants, it shall be deemed that the officers, directors, agents, employees, or representatives of the Defendants committed or authorized such act or omission, or failed to adequately supervise or properly control or direct their employees while engaged in the management, direction, operation, or control of the affairs of Defendants, and did so while acting within the scope of their duties, employment, or agency.

49.     Any and all references to a Defendant or Defendants in this Complaint include any predecessors, successors, parents, subsidiaries, affiliates, and divisions of the named Defendants.

50.     The term "AFFF Defendant" or "AFFF Defendants" refers to all Defendants named herein jointly and severally, unless otherwise stated, who designed, marketed, developed, manufactured, distributed, released, trained users, produced instructional materials, promoted, sold and/or otherwise handled and/or used PFAS-containing AFFF.

## FACTS

### The Fluorochemicals

51.     Fluorochemical products, including toxic chemicals collectively known as per and polyfluoroalkyl substances ("PFAS"), are man-made chemicals composed of a chain of carbon atoms in which all but one of the carbon atoms are bonded to fluorine atoms, and the last carbon atom is attached to a functional group. The carbon-fluorine bond is one of the strongest chemical bonds that occur in nature.

52.     Fluorochemical products are highly water soluble, which facilitates the ease at which they spread throughout the environment, contaminating soil, groundwater, and surface water. This mobility is made more dangerous by their persistence in the environment and resistance to biologic, environmental, or photochemical degradation.

53.     Fluorochemical products are readily absorbed in animal and human tissues after oral exposure and accumulate in the serum, kidney, and liver.

54.     Beginning in the 1950s, fluorochemical products were put into large scale manufacture and use.  Since then, they have been found globally in water, soil, and air as well as in human food supplies, breast milk, umbilical cord blood, and human blood serum.

55.     Fluorochemical products are persistent in the human body. In fact, a short-term exposure can result in a body burden that persists for years and can increase with additional exposures.

56.     Since they were first produced, information has emerged showing negative health effects caused by exposure to fluorochemical products.

57.     The United States Environmental Protection Agency ("EPA"), the World Health Organization ("WHO"), along with numerous other organizations, have concluded that exposure to fluorochemical products is harmful to human health and cause an increased risk of certain diseases, cancer, liver effects, immune effects, thyroid effects and other effects.

58.     According to the EPA, studies indicate that exposure to fluorochemical products over certain levels may result in developmental effects to fetuses during pregnancy or to breastfed infants (e.g., low birth weight, accelerated puberty, skeletal variations), cancer (e.g., testicular, kidney), liver effects (e.g., tissue damage), immune effects (e.g., antibody production and immunity), thyroid effects, and other effects (e.g., cholesterol changes).

59.     The EPA has noted that drinking water can be an additional source of PFAS in the communities where these chemicals have contaminated water supplies. "In communities with contaminated water supplies, such contamination is typically localized and associated with a specific facility, for example…an airfield … at which PFAS were used for firefighting."

60.    The EPA initially issued Health Advisory Levels of 70 parts per trillion ("ppt") for PFOA and PFOS found in drinking water.  However, in June 2022, the EPA issued interim updated health advisory levels for PFOA at .004 ppt and PFOS at .02 ppt.

61.    On information and belief, there is no safe level of exposure to fluorochemical products.

### PFAS-Containing Aqueous Film-Forming Foam ("AFFF")

62.    AFFF is a type of water-based foam that was first developed in the 1960s to extinguish flammable liquid fuel fires at airports and military bases, among other places.

63.    The AFFF designed, manufactured, marketed, distributed, used and/or sold by Defendants contained either or both PFOA and PFOS, including their precursors and/or derivatives.

64.    PFOS and/or the chemical precursors to PFOS contained in 3M's AFFF were manufactured by 3M's patented process of electrochemical fluorination ("ECF").

65.    All other Defendants manufactured fluorosurfactants for use in AFFF through the process of telomerization.  Telomerization produced fluorotelomers, including PFOA and/or the chemical precursors to PFOA.

66.    AFFF can be made without PFOA, PFOS, or their precursor chemicals. Fluorine-free foams and short-chains foams do not release PFOA, PFOS, and/or their precursor chemicals into the environment or pose a risk to human health.

67.    When used as AFFF Defendants intended and directed, AFFF Defendants' AFFF products release PFOA, PFOS, and/or their precursor chemicals into the environment.

18

68.     Once PFOA and PFOS are in the environment, these chemicals do not hydrolyze, photolyze, or biodegrade under typical environmental conditions and are extremely persistent in the environment. Because of their persistence, they are widely distributed throughout soil, air, and groundwater.

69.     Due to the chemicals' persistent nature, among other things, these chemicals have caused, and continue to cause, injury and damage to Plaintiff.

### Defendants' Knowledge

70.     On information and belief, by the 1960s, Defendants knew, or reasonably should have known, among other things, that: (a) PFAS are toxic; and (b) when sprayed in the open environment per the instructions given by the manufacturer, PFAS readily migrate through the subsurface, mix easily with groundwater, resist natural degradation, render drinking water unsafe and/or non-potable, and can be removed from public drinking water supplies only at substantial expense.

71.     Defendants also knew or reasonably should have known that PFAS could be absorbed into the lungs and gastrointestinal tract, potentially causing severe damage to the liver, kidneys, and central nervous system, in addition to other toxic effects, and that PFAS are known carcinogens which cause genetic damage.

72.     In 1980, 3M published data in peer-reviewed literature showing that humans retained PFOS in their bodies for years.  Based on that data, 3M estimated that it could take a person up to 1.5 years to clear just half of the accumulated PFOS from their body after all exposures had ceased.

73. By the early 1980s, the industry suspected a correlation between PFOS exposure and human health effects. Specifically, manufacturers observed bioaccumulation of PFOS in workers' bodies and birth defects in children of workers.

74. In 1981, DuPont tested for and found PFOA in the blood of female plant workers in Parkersburg, West Virginia. DuPont observed and documented pregnancy outcomes in exposed workers, finding two of seven children born to female plant workers between 1979 and 1981 had birth defects—one an "unconfirmed" eye and tear duct defect, and one a nostril and eye defect.

75. Beginning in 1983, 3M documented a trend of increasing levels of PFOS in the bodies of 3M workers. In an internal memo, 3M's medical officer warned "we must view this present trend with serious concern. It is certainly possible that … exposure opportunities are providing a potential uptake of fluorochemicals that exceeds excretion capabilities of the body."

76. Nonetheless, 3M continued to encourage and promote the use of PFOS as safe.

77. On information and belief, in 2000, under pressure from the EPA, 3M announced that it was phasing out PFOS and U.S. production of PFOS; however, 3M's PFOS-based AFFF production did not fully phase out until 2002.

78. From 1951, DuPont, and on information and belief, Chemours, designed, manufactured, marketed, and sold fluorochemical products, including Teflon nonstick cookware, and more recently, PFAS feedstocks, such as Forafac 1157 N, for the use in the manufacture of AFFF products.

79.     On information and belief, in 2001 or earlier, DuPont manufactured, produced, marketed, and/or sold fluorochemical products and/or PFAS feedstocks to some or all of the AFFF product manufacturers for use in AFFF products.

80.     DuPont had been studying the potential toxicity of PFOA since at least the 1960s and knew that it was contaminating drinking water drawn from the Ohio River, and did not disclose to the public or to government regulators what they knew about the substance's potential effects on humans, animals, and/or the environment.

81.     By December 2005, the EPA uncovered evidence that DuPont concealed the environmental and health effects of PFOA, and the EPA announced the "Largest Environmental Administrative Penalty in Agency History."

82.     The EPA fined DuPont for violating the Toxic Substances Control Act "Section 8(e)—the requirement that companies report to the EPA substantial risk information about chemicals they manufacture, process or distribute in commerce."

83.     By July 2011, DuPont could no longer credibly dispute the human toxicity of PFOA, which it continued to manufacture. The "C8 Science Panel" created as part of the settlement of a class action over DuPont's releases from its Washington Works plant reviewed the available scientific evidence and concluded that a "probable link" exists between PFOA exposure and the serious (and potentially fatal) conditions of pregnancy: induced hypertension and preeclampsia. By October 2012, the C8 Science Panel concluded that a probable link also exists between PFOA and five other conditions: high cholesterol, kidney cancer, thyroid disease, testicular cancer, and ulcerative colitis.

84.     In July 2015, DuPont spun off its chemicals division by creating Chemours as a new publicly traded company, once wholly owned by DuPont. By mid-2015, DuPont had dumped its perfluorinated chemical liabilities into the lap of the new Chemours.

85.     Notwithstanding this knowledge, Defendants negligently and carelessly: (1) designed, manufactured, marketed, distributed, and/or sold PFAS-containing products; (2) failed to issue reasonable warnings and/or instructions on how PFAS-containing products should be used and disposed of in AFFF products; (3) failed to recall and/or warn the users of fluorochemical products, which contained or degraded into PFOA and/or PFOS, of the dangers of surface water, soil, and groundwater contamination as a result of standard use and disposal of these products; and (4) further failed and refused to issue the appropriate warnings and/or recalls to the users of PFAS-containing products, notwithstanding the fact that Defendants knew the foreseeable identities of the purchasers and end-users of the PFAS-containing products, as well as its final fate in water, biota, and humans.

***Plaintiff's Exposure to PFAS-Containing AFFF Products***

86.     On information and belief, Plaintiff was exposed to Defendants' AFFF products which contained PFOA and/or PFOS chemicals and/or their precursor chemicals during Plaintiff's his time in the naval service, training, in shipboard firefighting, and the US Navy at Great Lakes, Illinois Recruit Training Center, Naval Training Center, Naval Submarine Base Connecticut, Dam Neck Virginia, Port Hueneme California, Yokosuka Japan, Pearl harbor HI CG, Norfolk VA CG, Yorktown VA, Chin-Hae Korea, Subic Bay Philippines, and USS Josephus Daniels, from approximately 1976 to 1982.

87.     Defendants designed, manufactured, marketed, distributed, and/or sold the AFFF products which contained PFOA and/or PFOS chemicals and/or their precursor chemicals to United States naval bases, training facilities, ships, and military bases.

88.     The descriptive labels and material safety data sheets for Defendants' AFFF products containing PFOA or PFOS and/or their precursor chemicals utilized within those states and locations where Plaintiff was exposed did not reasonably or adequately describe AFFF's risks to human health.

89.     Defendants knew or should have known of the hazards of AFFF products containing PFOA and/or PFOS and/or their precursor chemicals when the products were manufactured.

90.     Plaintiff did not know, and in the exercise of reasonable diligence could not have known, that the products used by Plaintiff in the course of performing Plaintiff's duties contained PFOA and/or PFOS materials.  The products used by Plaintiff did not and do not contain labeling information saying that the products contain PFOA and/or PFOS, and similarly did not and do not warn Plaintiff of the health risks associated with exposure to PFOA and/or PFOS.

91.     During Plaintiff's use of Defendants' AFFF products which contained PFOA and/or PFOS and/or their precursor chemicals, the PFOA and/or PFOS and/or their precursor chemicals entered Plaintiff's body.

92.     As a result of exposure to Defendants' AFFF products which contained PFOA and/or PFOS and/or their precursor chemicals, in approximately 2017, Plaintiff was diagnosed with hypothyroidism, a specific kind of thyroid disease.

93.     Sometime after Plaintiff's diagnosis, Plaintiff first discovered that Plaintiff's hypothyroidism, a specific kind of thyroid disease, and other illnesses were caused by exposure to Defendants' AFFF products.

94.     Plaintiff's hypothyroidism, a specific kind of thyroid disease, and other illnesses were directly and proximately caused by exposure to Defendants' PFOA and/or PFOS-containing AFFF products.

95.     Plaintiff suffered, and continues to suffer, the effects of his hypothyroidism, a specific kind of thyroid disease, and other illnesses which were directly and proximately caused by his exposure to Defendants' PFOA and/or PFOS-containing AFFF products.

<u>COUNT I</u>
**PRODUCTS LIABILITY – DEFECTIVE DESIGN**

96.     Plaintiff hereby incorporates by reference all allegations contained in the preceding paragraphs of this Complaint as if restated in full herein.

97.     At all times relevant to the Complaint, Defendants were regularly engaged in the design, formulation, production, creation, making, construction, assembly, rebuilding, sale, distribution, preparation, and/or labeling of PFAS-containing AFFF products.

98.     At all times pertinent to this Complaint, Defendants regularly participated in placing the PFAS-containing AFFF products into the stream of commerce in the United States, including within those states and locations where Plaintiff was exposed.

99.     As manufacturers, designers, refiners, formulators, distributors, suppliers, sellers, and/or marketers of PFAS-containing AFFF products, Defendants owed a duty to use reasonable care to all persons whom Defendants' products might foreseeably cause

harm, including Plaintiff, not to manufacture, sell, and/or market any product which is unreasonably dangerous for its intended and foreseeable uses.

100.    The Defendants exercised substantial control over the design, testing, manufacture, packaging, and/or labeling of the PFAS-containing AFFF products that proximately and directly caused Plaintiff's injuries.

101.    Plaintiff was an ordinary user and individual whom the Defendants reasonably should have foreseen would use their PFAS-containing AFFF products.

102.    Plaintiff used Defendants' PFAS-containing AFFF products in a reasonably foreseeable manner and in the manner and for the purposes for which they were intended.

103.    Plaintiff used Defendants' PFAS-containing AFFF products without substantial changes in the condition in which the products were sold.

104.    Plaintiff was not a sophisticated user of Defendants' PFAS-containing AFFF products.

105.    Defendants' PFAS-containing AFFF products used by Plaintiff did not perform as an ordinary consumer would have reasonably expected the products to perform when used as Plaintiff did in an intended or reasonably foreseeable manner because PFOA and PFOS are carcinogens and otherwise harmful to human health.

106.    Defendants' defective design of the PFAS-containing AFFF products was far more dangerous than Plaintiff or an ordinary consumer would expect when used, as Plaintiff did, in an intended and reasonably foreseeable manner.

107. The unreasonably dangerous and defective design of Defendants' PFAS-containing AFFF products was a substantial factor and the direct and proximate cause of Plaintiff's injuries.

108. Defendants could have manufactured, marketed, and sold alternative designs or formulations of AFFF products that did not contain harmful PFOA and/or PFOS.

109. The PFOA and/or PFOS contained within Defendants' AFFF products was not an inherent characteristic of the product that could not be eliminated without substantially compromising the AFFF products' usefulness and/or desirability.

110. Alternative designs and/or formulations were available, practical, reasonable, and technologically feasible during the relevant time Plaintiff was exposed to their PFAS-containing AFFF products.

111. The use of these alternative designs would have reduced or prevented the reasonably foreseeable harm to Plaintiff's health that was caused by Defendants' manufacture, marketing, and/or sale of their PFAS-containing AFFF products.

112. Defendants continued to manufacture, market, distribute, promote, and sell PFAS-containing AFFF products despite the availability of alternative designs.

113. The risks of PFAS-containing AFFF products were not obvious to users of AFFF, including Plaintiff, nor were they obvious to users in the vicinity of AFFF use, including Plaintiff, who were unwittingly exposed to Defendants' toxic and carcinogenic chemicals.

114.    Plaintiff, as an ordinary consumer, could not have reasonably discovered the defects, risks, and dangers associated with the use of PFAS-containing AFFF products and could not protect himself from exposure to Defendants' AFFF products.

115.    The unreasonably dangerous or hazardous properties of Defendants' PFAS-containing AFFF products were not apparent to Plaintiff, who was an ordinary user of the AFFF products who had ordinary knowledge common to the community.

116.    Plaintiff, as an ordinary user of Defendants' PFAS-containing AFFF products, was unaware that using Defendants' AFFF products created an unreasonable risk of personal injury to him.

117.    The benefits of Defendants' defective and unreasonably dangerous PFAS-containing AFFF products did not outweigh the unreasonably dangerous design's inherent risk of danger.

118.    Defendants knew or should have known about the inherent risk of harm based on the scientific, technical, and/or medical information reasonably available at the time their PFAS-containing AFFF products left their control.

119.    At the time of manufacture, sale, and/or distribution, Defendants had actual knowledge their AFFF products were defective and unreasonably dangerous and there was a substantial likelihood the defect would cause Plaintiff's injuries, and Defendants willfully disregarded that knowledge in the manufacture, sale, and/or distribution of their PFAS-containing AFFF products.

120.     As a direct and proximate result of Defendants' defective design, Plaintiff sustained injuries and has suffered and will continue to suffer some or all of the following damages:

     a.  Past, present, and future medical and hospital bills for diagnosis, monitoring, and treatment of injuries;

     b.  Physical injury, both temporary and permanent;

     c.  Economic damages;

     d.  Non-economic damages, including severe and significant emotional distress, mental pain, and suffering; humiliation, embarrassment, and fear;

     e.  Loss of enjoyment of life;

     f.  Annoyance and inconvenience; and

     g.  Other damages, which, under the law and circumstances, Plaintiff is entitled to recover, including attorneys' fees and costs associated with the prosecution of this action.

121.     Defendants' acts were willful, wanton, reckless and/or conducted with a reckless indifference to the rights of Plaintiff and constituted intentional or grossly negligent conduct.

122.     As a result of Defendants' design and formulation of a defective product, Defendants are strictly liable in damages to Plaintiff.

## COUNT II
## PRODUCTS LIABILITY – FAILURE TO WARN

123.     Plaintiff hereby incorporates by reference all allegations contained in the preceding paragraphs of this Complaint as if restated in full herein.

124.     At all times relevant to the Complaint, Defendants were regularly engaged in the design, formulation, production, creation, making, construction, assembly, rebuilding, sale, distribution, preparation, and labeling of PFAS-containing AFFF products.

125.     Defendants knew, or in the exercise of ordinary care, should have known that exposure to PFAS-containing AFFF products presented a substantial danger when used by ordinary users such as Plaintiff because it is hazardous to human health and the environment.

126.     Defendants knew, or in the exercise of ordinary care, should have known that the manner in which they were manufacturing, marketing, and/or selling PFAS-containing AFFF products would result in physical harm to Plaintiff.

127.     Ordinary consumers of Defendants' PFAS-containing AFFF products such as Plaintiff, who had ordinary knowledge common to the community, would not have recognized the risks.

128.     Plaintiff was an ordinary and foreseeable user of Defendants' PFAS-containing AFFF products.

129.     Plaintiff used Defendants' PFAS-containing AFFF products in a reasonably foreseeable manner.

29

130. Plaintiff used Defendants' PFAS-containing AFFF products in the manner and for the purposes for which they were intended.

131. All Defendants exercised substantial control over the design, testing, manufacture, packaging, and/or labeling of their PFAS-containing AFFF products that proximately and directly caused Plaintiff's injuries.

132. Defendants, as manufacturers and sellers of PFAS-containing AFFF products, had a duty to provide adequate warnings or instructions about the dangers of their products.

133. Defendants failed to adequately warn and instruct Plaintiff of the potential risks of PFAS-containing AFFF products, despite having superior knowledge of their AFFF products' defective and dangerous condition.

134. Adequate instructions and warnings on the PFAS-containing AFFF products could have reduced or avoided these foreseeable risks of harm to Plaintiff's health.

135. Had Defendants provided adequate warnings and instructions, Plaintiff could have taken measures to avoid or lessen the exposure.

136. Without adequate warnings or instructions, Defendants' PFAS-containing AFFF products were unsafe to an extent beyond that which would be contemplated by an ordinary person.

137. Defendants' failure to adequately warn and instruct Plaintiff of their unreasonably dangerous and defective PFAS-containing AFFF products was a direct and proximate cause of Plaintiff's injuries.

138. Defendants' failure to provide adequate and sufficient warnings and instructions for the PFAS-containing AFFF products that they manufactured, marketed, and/or sold rendered the AFFF products defective and unreasonably dangerous.

139. As a direct and proximate result of Defendants' failure to warn, Plaintiff has suffered and will continue to suffer some or all of the following damages:

    a. Past, present, and future medical and hospital bills for diagnosis, monitoring, and treatment of injuries;

    b. Physical injury, both temporary and permanent;

    c. Economic damages;

    d. Non-economic damages, including severe and significant emotional distress, mental pain, and suffering; humiliation, embarrassment, and fear;

    e. Loss of enjoyment of life;

    f. Annoyance and inconvenience; and

    g. Other damages, which, under the law and circumstances, Plaintiff is entitled to recover, including attorneys' fees and costs associated with the prosecution of this action.

140. But for Defendants' failure to provide sufficient warnings regarding their PFAS-containing AFFF products' unreasonable dangerousness, Plaintiff would not have suffered the damages alleged herein.

141.     Defendants' acts were willful, wanton, reckless and/or conducted with a reckless indifference to the rights of Plaintiff and constituted intentional or grossly negligent conduct.

142.     As a result of Defendants' failure to warn about the unreasonably dangerous conditions of the PFAS-containing AFFF products, Defendants are strictly liable to Plaintiff.

## COUNT III
## NEGLIGENCE

143.     Plaintiff hereby incorporates by reference all allegations contained in the preceding paragraphs of this Complaint as if restated in full herein.

144.     As manufacturers, refiners, formulators, distributors, suppliers, sellers, marketers, shippers, or handlers of PFAS-containing AFFF products, Defendants owed a duty to individuals, including Plaintiff, to exercise reasonable care in the manufacture, construction, design, formulation, development of standards, preparation, processing, assembly, testing, listing, certifying, warning, instructing, advertising, packaging, labeling, of and the handling, control, use and disposal of Defendants' products.

145.     Defendants breached their duty of care and were negligent as described herein in the design, manufacture, labeling, warning, instruction, training, selling, marketing, and distribution of their AFFF products or underlying PFAS containing chemicals used in AFFF production.

146.     Despite knowing that their PFAS-containing AFFF products are toxic and present significant risks to human health, Defendants failed to exercise reasonable care when they:

a.  Designed, manufactured, formulated, handled, labeled, instructed, controlled, marketed, promoted, and/or sold PFAS-containing AFFF products;

b.  Issued instructions on how PFAS-containing AFFF products should be used and disposed of;

c.  Failed to recall and/or warn the users of PFAS-containing AFFF products of the dangers to human health and water contamination as a result of standard use and disposal of these products; and

d.  Failed and refused to issue appropriate warnings and/or recalls to the users of PFAS-containing AFFF products regarding the proper use and disposal of these products, notwithstanding, the fact that Defendants knew, or could determine with reasonable certainty, the identity of the purchasers of their fluorochemical products.

147.    But for Defendants' negligent acts and/or omissions, Plaintiff would not have been exposed to unhealthy levels of fluorochemicals, thereby causing Plaintiff's injuries.

148.    As a direct and proximate result of Defendants' negligence and breach of duty, Plaintiff has been injured, sustained severe and permanent pain, suffering, disability, impairment, loss of enjoyment of life, loss of care, comfort, economic loss, and damages including, but not limited to, medical expenses, lost income, pain and suffering, and/or other damages.

## COUNT IV
## GROSS NEGLIGENCE

149.    Plaintiff hereby incorporates by reference all allegations contained in the preceding paragraphs of this Complaint as if restated in full herein.

150.    As manufacturers, refiners, formulators, distributors, suppliers, sellers, marketers, shippers, or handlers of PFAS-containing AFFF products, Defendants owed a duty to individuals, including Plaintiff, to exercise reasonable care in the manufacture, construction, design, formulation, development of standards, preparation, processing, assembly, testing, listing, certifying, warning, instructing, advertising, packaging, labeling, of and the handling, control, use and disposal of Defendants' products.

151.    Defendants breached their duty of care and were grossly negligent, reckless, and willful as described herein in the design, manufacture, labeling, warning, instruction, training, selling, marketing, and distribution of their AFFF products or underlying PFAS containing chemicals used in AFFF production.

152.    Despite knowing that their PFAS-containing AFFF products are toxic and present significant risks to human health, Defendants were grossly negligent, reckless, and willful when they:

    a.  Designed, manufactured, formulated, handled, labeled, instructed, controlled, marketed, promoted, and/or sold PFAS-containing AFFF products;

    b.  Issued instructions on how PFAS-containing AFFF products should be used and disposed of;

    c.  Failed to recall and/or warn the users of PFAS-containing AFFF

34

products of the dangers to human health and water contamination

as a result of standard use and disposal of these products; and

d.  Failed and refused to issue appropriate warnings and/or recalls to

the users of PFAS-containing AFFF products regarding the proper

use and disposal of these products, notwithstanding, the fact that

Defendants knew, or could determine with reasonable certainty,

the identity of the purchasers of their fluorochemical products.

153.    But for Defendants' grossly negligent, reckless, and willful acts and/or omissions, Plaintiff would not have been exposed to unhealthy levels of fluorochemicals, thereby causing Plaintiff's injuries.

154.    As a direct and proximate result of Defendants' grossly negligent, reckless, and willful, Plaintiff has been injured, sustained severe and permanent pain, suffering, disability, impairment, loss of enjoyment of life, loss of care, comfort, economic loss, and damages including, but not limited to, medical expenses, lost income, pain and suffering, and/or other damages.

## COUNT V
## BATTERY

155.    Plaintiff hereby incorporates by reference all allegations contained in the preceding paragraphs of this Complaint as if restated in full herein.

156.    At all relevant times, Defendants possessed knowledge that the PFAS-containing AFFF products which they designed, engineered, manufactured, fabricated, sold, handled, released, trained users on, produced instructional materials for, used, and/or distributed were bio-persistent, bio-accumulative, toxic, potentially carcinogenic, and/or

otherwise harmful/injurious and that their continued manufacture, use, sale, handling, release, and distribution would result in Plaintiff having PFAS in Plaintiff's blood, and the biopersistence and bioaccumulation of such PFAS in Plaintiff's blood.

157.    Despite possessing such knowledge, Defendants knowingly, purposefully, and/or intentionally continued to engage in such acts and/or omissions, including but not limited to all such acts and/or omissions described in this Complaint, that continued to result in Plaintiff accumulating PFAS in Plaintiff's blood and/or body, and such PFAS persisting and accumulating in Plaintiff's blood and/or body.

158.    Defendants did not seek or obtain permission or consent from Plaintiff to put or allow PFAS materials into Plaintiff's blood and/or body, or to persist in and/or accumulate in Plaintiff's blood and/or body.

159.    Entry into, persistence in, and accumulation of such PFAS in Plaintiff's body and/or blood without permission or consent is an unlawful and harmful and/or offensive physical invasion and/or contact with Plaintiff's person and unreasonably interferes with Plaintiff's rightful use and possession of Plaintiff's blood and/or body.

160.    At all relevant times, the PFAS present in Plaintiff's blood originated from Defendants' acts and/or omissions.

161.    Defendants continue to knowingly, intentionally, and/or purposefully engage in acts and/or omissions that result in the unlawful and unconsented-to physical invasion and/or contact with Plaintiff that resulted in persisting and accumulating levels of PFAS in Plaintiff's blood.

162.    Defendants acted intentionally with the knowledge and/or belief that the

contact, presence and/or invasion of PFAS with, onto, and/or into Plaintiff's blood serum, including its persistence and accumulation in such serum, was substantially certain to result from those very acts and/or omissions.

163.     Defendants' intentional acts and/or omissions resulted directly and/or indirectly in harmful contact with Plaintiff's blood and/or body.

164.     The continued presence, persistence, and accumulation of PFAS in the blood and/or body of Plaintiff is offensive, unreasonable, and/or harmful, and thereby constitutes a battery.

165.     As a direct and proximate result of the foregoing acts and omissions, Plaintiff suffered physical injury for which Defendants are therefore liable.

**COUNT VI**
**FRAUDULENT CONCEALMENT**

166.     Plaintiff hereby incorporates by reference all allegations contained in the preceding paragraphs of this Complaint as if restated in full herein.

167.     At all times relevant to this Complaint, Defendants knew that their PFAS-containing AFFF products were defective and unreasonably unsafe for their intended purpose.

168.     For at least several decades, Defendants were aware of the bio-accumulative and bio-persistent nature of the fluorochemicals they manufactured, sold, designed, distributed, marketed, and supplied.

169.     Defendants were also aware of the fluorochemicals products' harmful effects to humans.

170.     In connection with the PFAS-containing AFFF products, Defendants have

had, and continue to have, a general duty of care to disclose to Plaintiff the actual and potential harm to Plaintiff's person as a direct and proximate result of Defendants' acts and/or omissions, including a general duty of care to disclose to Plaintiff that Defendants had, and were continuingly, exposing Plaintiff to harmful levels of PFAS-containing AFFF products.

171.    Through Defendants' superior knowledge, responsibility, and/or control over the fluorochemical products, and Defendants' voluntary actions and/or representations, a relationship of trust and confidence existed between Defendants and Plaintiff.

172.    Despite Defendants' knowledge regarding fluorochemical exposure, and despite Defendants' duties to disclose to Plaintiff, Defendants knowingly, intentionally, maliciously, willfully, wantonly, recklessly, and/or negligently withheld, misrepresented, and/or concealed information regarding Defendants' AFFF products from Plaintiff, who had a right to know of information which would have prevented him from being exposed and/or continuing to be exposed to the PFAS-containing AFFF products.

173.    Defendants withheld, misrepresented, and/or fraudulently concealed information regarding PFAS-containing AFFF exposure from Plaintiff with the intention to mislead and/or defraud Plaintiff into believing that Plaintiff's AFFF exposure was not harmful, and to mislead and/or defraud Plaintiff into continuing to use their AFFF products.

174.    Defendants withheld, misrepresented, and/or concealed information regarding PFAS-containing AFFF exposure, which was a substantial factor in causing Plaintiff's harm.

38

175.     Defendants not only withheld, misrepresented, and/or concealed material information from Plaintiff but also committed fraud against Plaintiff by affirmatively representing to Plaintiff that their PFAS-containing AFFF products were harmless and/or did not present any risk of harm, when Defendants knew, reasonably should have known, and/or with utter disregard and recklessness as to whether it was true or not, that Defendants' AFFF products had caused, and were continuing to cause, bodily injury and/or risk of such bodily injury to Plaintiff.

176.     Defendants' representations to Plaintiff were knowingly, intentionally, negligently, and/or recklessly false.

177.     Defendants' affirmative representations and/or omissions to Plaintiff were false and were material to Plaintiff in forming Plaintiff's belief that Defendants' PFAS-containing AFFF products were safe, in causing Plaintiff to continue to use the AFFF products, and in causing Plaintiff to not seek treatment and/or ways to remedy his past and continuing exposure to AFFF products.

178.     Defendants made the affirmative representations and/or omissions to Plaintiff with the intention that Plaintiff would be misled into relying on such affirmative representations and/or omissions.

179.     Plaintiff relied on Defendants' affirmative representations and/or omissions in forming the belief that Defendants' AFFF products were safe.

180.     As a direct and proximate result of the aforesaid acts and/or omissions by Defendants, Plaintiff was exposed to Defendants' PFAS-containing AFFF products and was injured, and Defendants are liable in damages to Plaintiff.

## COUNT VII
## ACTUAL FRAUDULENT TRANSFER
### (Against DuPont and Chemours Co.)

181.    Plaintiff hereby incorporates by reference all allegations contained in the preceding paragraphs of this Complaint as if restated in full herein.

182.    Through their effectuation of the Spinoff, Chemours Co. and DuPont (the "Fraudulent Transfer Defendants") caused Chemours Co. to transfer valuable assets to DuPont, including but not limited to the $3.9 billion dividend (the "Transfers"), while simultaneously assuming significant liabilities (the "Assumed Liabilities").

183.    The Transfers and Assumed Liabilities were made for the benefit of DuPont.

184.    At the time that the Transfers were made, and the Liabilities were assumed, and until the spinoff was complete, DuPont was in a position to, and in fact did, control and dominate Chemours Co.

185.    The Fraudulent Transfer Defendants made the Transfers and incurred the Assumed Liabilities with the actual intent to hinder, delay, and defraud the creditors or future creditors of Chemours Co.

186.    Plaintiff has been harmed and will be harmed as a result of the conduct of the Fraudulent Transfer Defendants.

187.    Plaintiff is entitled to avoid the Transfers and to recover property or value transferred to DuPont.

## COUNT VIII
## CONSTRUCTIVE FRAUDULENT TRANSFER
### (Against DuPont and Chemours Co.)

188.     Plaintiff hereby incorporates by reference all allegations contained in the preceding paragraphs of this Complaint as if restated in full herein.

189.     Chemours Co. did not receive reasonably equivalent value from DuPont in exchange for the Transfers and Assumed Liabilities.

190.     Each of the Transfers and the assumption of the Assumed Liabilities by Chemours Co. was made to or for the benefit of DuPont.

191.     At the time that the Transfers were made, and the Assumed Liabilities were assumed, and until the Spinoff was complete, DuPont was in a position to, and in fact did, control and dominate Chemours Co.

192.     The Fraudulent Transfer Defendants made the Transfers and assumed the Assumed Liabilities when Chemours Co. was engaged or about to be engaged in a business for which its remaining assets were unreasonably small in relation to its business.

193.     Chemours Co. was insolvent or in contemplation of insolvency at the time of the Transfers or became insolvent as a result of the Transfers and its assumption of the Assumed Liabilities.

194.     At the time that the Transfers were made, and Chemours Co. assumed the Assumed Liabilities, the Fraudulent Transfer Defendants intended to incur, or believed or reasonably should have believed, that Chemours Co. would incur debts beyond its ability to pay as they became due.

195.     Plaintiff has been harmed and will be harmed as a result of the Transfers.

196.     Plaintiff is entitled to avoid the Transfers and to recover property or value transferred to DuPont.

## <u>COUNT IX</u>
## BREACH OF EXPRESS AND IMPLIED WARRANTIES

197.     Plaintiff hereby incorporates by reference all allegations contained in the preceding paragraphs of this Complaint as if restated in full herein.

198.     At all times relevant hereto, Defendants manufactured, marketed, labeled, and/or sold AFS-containing AFFF products as described herein.

199.     At the time Defendants designed, developed, marketed, sold, labeled, and distributed PFAS-containing AFFF products, Defendants knew of the use for which these products were intended, and implied and/or expressly warranted that the product was merchantable, safe, and fit for its intended purpose.

200.     Defendants warranted that the product was merchantable and fit for the particular purpose for which it was intended and would be reasonably safe.

201.     These warranties were breached, and such breach directly and proximately caused Plaintiff's injuries and damages.

202.     Plaintiff is within the class of foreseeable users and reasonably relied upon Defendants' judgment, and the implied and/or express warranties in using the products.

203.     Defendants breached their implied and/or express warranties and did not meet the expectations for the performance of the product when used for its intended use and was neither of merchantable quality nor safe for its intended use in that the product has a propensity to cause serious injury.

204.     Plaintiff has been harmed and will be harmed as a result of Defendants'

breach of their implied and/or express warranties.

## COUNT IX
## MEDICAL MONITORING

205.    Plaintiff hereby incorporates by reference all allegations contained in the preceding paragraphs of this Complaint as if restated in full herein.

206.    Medical monitoring is available to Plaintiff as a stand-alone cause of action because of the increased risk of developing the diseases and conditions discussed herein constitute an injury-in-fact.

207.    Plaintiff seeks consequential damages sufficient to fund a medical monitoring program that is reasonably tailored to the exposure risks of the contaminants released by Defendants' AFFF products, including but not limited to PFOS, PFOA, and/or their chemical precursors.

208.    Defendants knew or should have known that exposure to PFAS was hazardous to human health.

209.    Defendants knew or should have known that the manner in which they were manufacturing, marketing, and selling their AFFF products containing PFOS, PFOA, and/or their chemical precursors would result in Plaintiff being exposed to increased levels of PFAS.

210.    Defendants' continued negligent acts and omissions in manufacturing, marketing, and selling their AFFF products were the proximate cause of Plaintiff's exposure to PFAS.

211.    The resulting exposure significantly increased Plaintiff's risk of contracting serious health conditions, including but not limited to prostate cancer, kidney cancer,

testicular cancer, ulcerative colitis, thyroid disease, pregnancy induced hypertension (including preeclampsia), hypercholesterolemia, and autoimmune diseases such as sarcoidosis.

212.    Plaintiff has also experienced fear and anxiety as a result of Plaintiff's increased risk of contracting the aforementioned conditions.

213.    The significantly increased health risks associated with exposure to PFOS, PFOA, and/or their chemical precursors make periodic diagnostic medical examinations reasonable and necessary.

214.    Plaintiff has incurred expenses and will incur future expenses for medical monitoring and, as a result, seeks payment of related medical expenses as an element of the damages Plaintiff is entitled to from Defendants.

215.    To compensate Plaintiff for damages suffered due to Defendants' acts, Plaintiff requires, among other things, that Defendants collectively pay the past and future costs of obtaining necessary medical care, toxicological examinations and diagnoses, and any other medical monitoring necessary to ascertain and treat any current or future injuries suffered as a result of Plaintiff's exposure to PFAS, with Plaintiff retaining the freedom to choose medical providers. Many of these costs would not be covered by health care insurers, and if covered, may unfairly result in increased premiums.

216.    The increased susceptibility to certain injuries and irreparable threat to future health and well-being Plaintiff faces as a result of Plaintiff's exposure to increased levels of PFAS can only be mitigated and/or addressed by the creation of a medical monitoring program (the "Monitoring Program") that includes but is not limited to:

a.   Establishing a program that provides education and outreach on the existence and availability of the services established under the Monitoring Program, including but not limited to the establishment of a public website with information about the Monitoring Program, meetings with potentially eligible members, development and dissemination of outreach materials about the program, and the establishment of phone information services;

b.   Funding additional studies of the long-term effects of exposure to PFOS, PFOA, and/or their chemical precursors;

c.   Funding medical surveillance;

d.   Funding research into possible treatments for the detrimental effects of PFAS exposure suffered by Plaintiff as a result of the acts and omissions alleged here;

e.   Gathering and forwarding to Plaintiff's treating physicians information related to the diagnosis and treatment of injuries resulting from Plaintiff's exposure to PFAS; and

f.   Assisting in the early diagnosis and treatment of injuries resulting from exposure to PFAS through ongoing testing and monitoring of Plaintiff.

217.   Prescribed monitoring procedures exist that make the early detection of these diseases possible.

218.   These monitoring procedures or regimes are different from normally recommended procedures that would be used in the absence of the exposure.

219.    The prescribed medical surveillance is reasonably necessary according to contemporary scientific principles for persons such as Plaintiff, who have been exposed and continue to be exposed to excessive levels of PFAS.

220.    Plaintiff will suffer irreparable harm if the Monitoring Program is not implemented because Plaintiff is in danger of suffering serious health conditions as a result of Plaintiff's prolonged exposure to the contaminants described herein.

221.    Detection of these diseases and early treatment is medically reasonable and necessary to prevent additional injury and/or injury progression.

222.    It is also medically reasonable and necessary to collect data and coordinate study efforts for persons exposed to such substances in order to effectively treat Plaintiff.

223.    Establishment of the Monitoring Program is an essential part of the consequential damages for Plaintiff's exposure to PFAS because without said program, Plaintiff will be subjected to additional injury and/or injury progression.

224.    Plaintiff requests that the Court appoint a plan administrator, require Defendants to fund the medical monitoring plan, and reserve jurisdiction to enforce the terms and conditions of the Monitoring Program.

## <u>COUNT X</u>
## PUNITIVE DAMAGES

225.    Plaintiff hereby incorporates by reference all allegations contained in the preceding paragraphs of this Complaint as if restated in full herein.

226.    At all times relevant to the present cause of action, Defendants manufactured, marketed, and/or sold PFAS-containing AFFF products that were used by Plaintiff and that resulted in the physical bodily injuries that Plaintiff has suffered and will

46

continue to suffer.

227.    At the time the above-described, affirmative, voluntary, and intentional acts were performed by Defendants, Defendants had good reason to know or expect that their AFFF products contained toxic PFAS chemicals capable of causing harm to human health.

228.    Defendants' negligent, reckless, willful, fraudulent, and/or wanton actions and/or intentional failures to act caused Plaintiff to be exposed to PFAS-containing AFFF products.

229.    Defendants issued no warnings and failed to divulge material information concerning the release of fluorochemicals and failed to take all reasonable measures to ensure their PFAS-containing AFFF products would be used effectively and properly disposed of.

230.    Defendants failed to prevent the foreseeable impacts of fluorochemical exposure upon the Plaintiff.

231.    Defendants withheld, misrepresented, and/or concealed information regarding the releases of fluorochemicals from their AFFF products and exposure to Plaintiff, other exposed individuals, and the public with the intention to mislead and/or defraud them into believing that their exposure to fluorochemical products was not harmful, and to mislead and/or defraud them into continuing to purchase and/or use Defendants' AFFF products.

232.    Defendants continued to manufacture, sell, market, distribute, design, formulate and/or supply PFAS-containing AFFF products for years after learning of the

significant risks to human health.

233.    Defendants have demonstrated an outrageous conscious disregard for the physical safety of Plaintiff and acted with implied malice, warranting the imposition of punitive damages.

234.    Defendants' conduct involved wanton, willful, and/or a conscious and reckless disregard for the health, safety, property, and rights of others, and the Court should award Plaintiff punitive damages in an amount sufficient to deter and punish such conduct.

## COUNT XI
## LOSS OF CONSORTIUM

235.    Plaintiff hereby incorporates by reference all allegations contained in the preceding paragraphs of this Complaint as if restated in full herein.

236.    Plaintiffs allege they are husband and wife.

237.    As a result of the tortious conduct of Defendants' described in the preceding paragraphs, Plaintiffs assert that their marriage and marital relationship was interrupted and continues to be interrupted.

238.    The severe, unremitting pain from which Plaintiff Daniel Cohen suffers, as well as the disability sustained as a result of the tortious conduct of Defendants, has permanently interrupted and damaged the Plaintiffs' marriage and Plaintiff Daniel Cohen's ability to function as a normal husband.

239.    As a result of Defendants' tortious conduct, Plaintiff Cherrie Cohen hereby asserts a claim for loss of consortium, including but not limited to loss of companionship and comfort.

## TOLLING OF THE STATUTE OF LIMITATIONS

### Discovery Rule Rolling

240.    Plaintiff, as a reasonable person, had no way of knowing about the risk of serious injury associated with the exposure to Defendants' PFAS-containing AFFF products until very recently.

241.    Until very recently, Plaintiff could not have discovered, through the exercise of reasonable diligence, that exposure to PFAS-containing AFFF products is harmful to human health.

242.    Plaintiff did not discover and did not know of facts that would cause a reasonable person to suspect the risk associated with the use of and/or exposure to PFAS-containing AFFF products, nor would a reasonable and diligent investigation by Plaintiff have discovered that PFAS-containing AFFF products could cause personal injury.

243.    For these reasons, all applicable statutes of limitations have been tolled by operation of the discovery rule with respect to Plaintiff's claims.

### Fraudulent Concealment Tolling

244.    All applicable statute of limitations have also been tolled by Defendants' knowledge and active fraudulent concealment and denial of the facts alleged herein throughout the time period relevant to this action.

245.    Instead of disclosing critical safety information regarding their PFAS-containing AFFF products, Defendants have consistently and falsely represented the safety of their PFAS-containing AFFF products.

246.    This fraudulent concealment continues through the present day.

247.    Due to this fraudulent concealment, all applicable statutes of limitations have been tolled by operation of the discovery rule with respect to Plaintiff's claims.

### Estoppel

248.    Defendants were under a continuous duty to consumers, end users, and other persons coming into contact with their products, including Plaintiff, to accurately provide safety information concerning its products and the risk associated with the use of and exposure to their PFAS-containing AFFF products.

249.    Instead, Defendants knowingly, affirmatively, and actively concealed safety information concerning PFAS-containing AFFF products and the serious risk associated with the use of and exposure to their PFAS-containing AFFF products.

250.    Based on the foregoing, Defendants are estopped from relying on any statute of limitations in defense of this action.

### <u>JURY DEMAND</u>

251.    Plaintiffs demand a trial by jury of all claims and issues asserted in this Complaint.

### <u>PRAYER FOR RELIEF</u>

**WHEREFORE**, the Plaintiffs demand judgment against Defendants, and each of them, jointly and severally, and requests the following relief from the Court:

a.    Compensatory damages, including but not limited to cost of past, present, and future medical bills associated with the diagnosis and treatment related to Plaintiff's AFFF exposure; lost wages or income; loss of consortium and past, present, and future pain and

suffering incurred by Plaintiffs in the amount of greater than $75,000;

b. Punitive damages  in an amount to sufficiently deter Defendants' similar wrongful conduct in the future;

c. Reasonable fees for attorneys and expert witnesses;

d. Costs and disbursements of this lawsuit;

e. Interest on the damages according to law; and

f. Any other and further relief as the Court deems just, proper and equitable.

Respectfully submitted,

**THE PELS LAW FIRM L.L.C**
<u>/s/ Jon D. Pels</u>
Jon D. Pels, Esq., MD Bar No.: 11883
jpels@pelslaw.com
The Pels Law Firm LLC
4845 Rugby Avenue, Third Floor
Bethesda, MD 20814
(301) 986-5570 (T)
(301) 986-5571 (F)
*Counsel for Plaintiffs*

Date: May 28, 2025